UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
UNITED STATES OF AMERICA,

              Plaintiff,

                                            MEMORANDUM AND ORDER
   -against-                                    05 CR 401 (ILG)

JAMES McTIER and
SHARIEF RUSSELL,

              Defendants.
-----------------------------------------------x
GLASSER, United States District Judge:

      The warden of the Metropolitan Correction Center (MCC) was ordered to show cause why he should (1) not be directed to remove the defendant McTier from administrative detention in the Special Housing Unit (SHU), and place him in the general population; (2) not be directed to immediately take steps to restore the list of people to whom defendant McTier may make phone calls which was apparently deleted due to a computer malfunction and/or human error, and (3) not grant such further relief to the defendant McTier that this Court deems just and proper.

      The warden was also ordered to show cause why he should (1) not be directed to release the defendant Russell from the SHU and place him in the general population; (2) not be directed to take the necessary steps to restore the visiting rights of the defendant Russell's mother, Ms. Elizabeth Jones, who has not been cleared to visit him since he was transferred to the MCC; and (3) not grant such further relief to the defendant Russell that this Court deems just and proper.

      In an indictment filed on May 20, 2005, and a superseding indictment filed on November 2, 2005, McTier and Russell, together with five others, were charged in twenty eight counts with a variety of crimes. More specifically, McTier and Russell were

charged with racketeering and racketeering conspiracy. McTier was charged with three counts of murder in aid of racketeering; three counts of attempted murder in aid of racketeering; one count of conspiracy to commit murder in aid of racketeering; one count of assault in aid of racketeering; and four counts of using and carrying a firearm in relation to a crime of violence. Russell was charged with one count of murder in aid of racketeering; one count of attempted murder in aid of racketeering; and two counts of using and carrying a firearm in relation to a crime of violence. Orders of detention were issued as to both.

McTier is a sentenced state inmate with a conditional release date of July 18, 2006, who was initially housed federally pursuant to a writ in the Metropolitan Detention Center (MDC) in Brooklyn. On January 11, 2006, he was transferred from the MDC to the MCC in Manhattan and admitted to the SHU pending classification and where he still remains.

Russell was transferred from the MDC to the MCC on March 3, 2006, and he too was admitted to the SHU pending classification where he still remains.

The warden submitted written responses and appeared by members of the MCC legal staff. His written response regarding McTier emphasized that his "administrative detention status is not punitive, rather it was implemented pursuant to the Bureau of Prisons' regulations and policies for the safety of inmates, staff and others, and to maintain the security and good order of this facility." The specific concerns which counseled the propriety of administrative detention were stated to be "his gang affiliations, his current offenses involving multiple murders and attempted murders for which he is eligible for the death penalty if convicted and his extensive history of

violence consisting of robbery and menacing with a weapon. . . . His institutional adjustment while housed in general population at MDC Brooklyn was poor involving two disciplinary infractions within five months of each other" one of which involved a fight with another inmate.

The warden's written response regarding Russell echoed his response regarding McTier, namely, that his admission to the SHU was not punitive but deemed necessary for the safety of inmates and staff and for the security and orderly administration of the facility. The offenses for which he was detained mirrored those of McTier in addition to attempted murders of law enforcement officers and his extensive criminal history of violence involving assaults, robberies, attempted rape, attempted murder, resisting arrest, possession of weapons, possession of contraband while in prison and bribery of an official.

We begin with <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979), in which the Court discussed the factors, legal and practical, that must be considered in addressing conditions of pretrial detention which are challenged as violating the demands of due process. In deciding whether the particular condition of pretrial detention is unconstitutional the Court must determine whether the condition complained of is imposed to punish or whether it is imposed to serve and is reasonably related to a legitimate governmental objective. 441 U.S. at 538. That, in essence, is the legal factor. The practical factors are the government's legitimate interest to maintain order and security that may justify conditions and restrictions of pretrial detention that negate any inference that they are intended as punishment. 441 U.S. at 540. In that vein, the Court cautioned that "Prison administrators . . . should be accorded wide-ranging deference in the adoption and

execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. Such considerations are peculiarly within the province and professional expertise of corrections officials, and in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." 441 U.S. at 547-48 (internal citations omitted).

The Code of Federal Regulations pertaining to inmate discipline and special housing units reflect the observations in <u>Bell v. Wolfish</u>. They embody the procedures which must be resorted to in determining whether assignment of these defendants to the SHU was for the purpose of punishment rather than for some other legitimate purpose and provide the administrative process for challenging that assignment.

28 CFR § 541.10 provides that prison authorities can impose discipline on inmates whose behavior does not comply with Bureau of Prisons rules so that inmates may live in a safe and orderly environment provided that disciplinary action is not capricious and retaliatory and applied consistently and impartially.

28 CFR § 541.22 defines Administrative detention as confinement in a special housing unit which serves to remove the inmate from the general population. Section 541.22(a) provides that the Warden may place a new inmate in administrative detention pending classification or when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution.

§ 541.22(b) requires the Warden to prepare an administrative detention order detailing the reasons for placing an inmate in administrative detention with a copy given

to the inmate within 24 hours of his placement.

§ 541.22(c) requires the Segregation Review Official (SRO) to conduct a record review within 3 work days of the inmate's placement and hold a hearing and formally review the status of any inmate who spends 7 continuous days in such detention and thereafter shall review the case on the record (in the inmate's absence) each week and shall hold a hearing and review the case formally at least every 30 days. The inmate appears before the SRO at the hearing unless he waives his right to appear in a signed writing.

If the administrative detention continues beyond 30 days, a psychiatric or psychological assessment including a personal interview shall be conducted by the staff. The assessment shall be submitted to the SRO in a written report, shall address his adjustment to his surroundings and the threat he poses to self, staff and other inmates. Similar assessments shall be conducted by staff within one month intervals.

Administrative detention is to be used only for short periods of time except where he needs long term protection (see § 541.23), or where there are exceptional circumstances, ordinarily tied to security or complex investigative concerns. The SRO shall release an inmate from administrative detention when reasons for it cease to exist.

I.   <u>Has the BOP complied with the Code of Federal Regulations</u>

Submitted by the Bureau of Prisons in response to the Order to Show Cause was a sheaf of documents pertaining to James McTier which are hereafter described and summarized. Upon his arrival at the MCC on January 11, 2006, an Administrative Detention Order was issued by a BOP Lieutenant to whom authority may be delegated by the Warden in accordance with CFR § 541.22(a). The stated reason was the

Lieutenant's decision "based on all the circumstances that [his] continued presence in the general population poses a serious threat to life, property, self, staff, other inmates, or to the security or orderly running of the institution because you are being placed in administrative detention pending intel review." The Order states that the defendant received a copy of it within 24 hours of his placement as witnessed by a staff witness and in accordance with CFR § 541.22(b).

Also submitted in response to the Order to Show Cause were Special Housing Review forms which reflect that a record review was conducted on January 14, 2006, within 3 days of McTier's placement in administrative detention, each week and every 30 days thereafter as required by CFR § 541.22(c).

Although the Regulation speaks of a "hearing," in response to the Order to Show Cause, Les Owen, the Supervising Attorney at the MCC stated that "There is no outline procedure, there are no due process requirements" as there would be for a discipline proceeding. "When you are dealing with the SHU, with folks who have dangerous pasts, a history of violence, very serious charges, these folks are not the kind of folks you want to take out of a cell to sit down in front of you at a desk to have a formal discussion. The discussion generally takes place through the glass of the cell door. Lieutenant does rounds every single day up there. Sort of takes all these meetings into account. He meets with the men. It is every day. The department heads meet up there every week. They review these cases with these men when the Lieutenant will look at them and talk to them through the window. How are you doing, do you have any problems, asking a series of questions as to how he is adjusting to the SHU. The Lieutenant then takes the information and that is considered the hearing."     Tr. of May 25, 2006, pp. 16-17.

In each of the Special Housing Review forms, the Reason for Placement is stated to be on one dated 3/20/06 "Intel Review/Security Concerns" and the others dated 4/19/06 and 5/19/06 "Murder/RICO." Each form also reflects that the "Inmate appeared for a special housing review;" that he was seen daily by the medical staff and by a responsible officer designated by the Warden; that he received his weekly exercise; that there is a written psychiatric or psychological assessment of the inmate who has spent 30 days in a SHU status and that there is an additional assessment every one month interval thereafter; that he received a written copy of the staff's decision and the basis for the finding at each 30 day review and that there was no change in his current status. Each form was signed by a Segregation Review Official.

Sharief Russell was transferred to the MCC from the MDC on March 3, 2006. The Special Housing Review forms submitted as to him reflect essentially the same information as those indicated above for McTier. The reason stated for his administrative detention is Security Concerns.

Counsel for McTier and Russell contend, essentially, that others who were charged with crimes of violence, including murder, have been permitted to be housed with the general population and therefore, placing these defendants in administrative detention can only be for reasons that are punitive and not for the purpose of achieving some legitimate governmental objective. They rely primarily upon United States v. Gotti, 755 F. Supp. 1159 (E.D.N.Y. 1991); United States v. Basciano, 369 F. Supp.2d 344 (E.D.N.Y. 2005) and Elmaghraby v. Ashcroft, 2005 WL 2375202 (E.D.N.Y. 2005).

These cases are easily distinguished. In Elmaghraby the plaintiffs brought suit against multiple defendants seeking damages pursuant to Bivens v. Six Unknown

7

Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), alleging violations of their Constitutional rights under the I, IV, V, VI and VIII Amendments and also asserting claims under the Alien Tort Statute, the Religious Freedom Restoration Act and the Federal Tort Claims Act. The defendants moved to dismiss those claims pursuant to Fed. R. Civ. P. 12(b)(6). The court assumed as it must, that all the allegations in the complaint were true and his comprehensive and scholarly opinion was predicated upon that assumption of facts which are starkly different from those before me. In Gotti, this Court found that the only reason for the administrative detention, without more, was the nature of the charges against those defendants and the "jailer's subjective belief of what was in the detainee's mind . . . ." 755 F. Supp. at 1164. As has been indicated above, here there is more. It should also be noted that in Gotti, no claim was made that administrative remedies were required to be exhausted as a pre-condition to the Court's jurisdiction. That claim is made here. A plain reading of Basciano would lead to the conclusion that the administrative detention of that defendant was determined upon the prosecutor's insistence that the detention was necessary to prevent Basciano from continuing to direct the affairs of the Bonnano organized crime family which his confinement in the general prison population would enable him to do and for no other legitimate governmental objective needed to preserve and maintain institutional security.

    The oral presentation of both sides on the return day of the Order to Show Cause and their written submissions thereafter are, not surprisingly, irreconcilable. In a letter dated June 2, 2006, counsel for McTier responds to a question posed by the Court "whether a pretrial detainee can be confined in administrative detention simply on the

8

nature of his alleged crime and on his alleged membership in a gang," with the "short answer is no, both substantively and procedurally." He asserts that the BOP has presented no particularized evidence at all that defendant's presence in the general population would pose a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution then acknowledges that "this sort of specific reason for keeping an inmate in solitary confinement is what the regulation contemplates. BOP regulations, codified at 28 CFR § 514.22 require <u>individualized determinations concerning the appropriateness of continued segregation</u>." Citing <u>Elmaghraby</u> at *18. (emphasis mine). Given the recognition that a determination concerning the appropriateness of administrative detention requires an individualized determination, the question then is what "particularized evidence" is necessary to support that determination beyond the significance which the crimes with which the inmate is charged and his criminal and behavioral history has to the prison administrator responsible for preserving internal order, discipline and maintaining institutional security. The determination based upon those factors that administrative detention is appropriate is "accorded wide-ranging deference." <u>Bell v. Wolfish</u>, 441 U.S. at 547.

Informative in this regard is the following observation made by the Court in <u>Hewitt v. Helms</u>, 459 U.S. 460, 474 (1983), rev'd. on other grounds by <u>Sandin v. Conner</u>, 515 U.S. 472 (1995):

> In assessing a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead they must consider the character of the inmates confined in the institution, recent and longstanding relations between

> prisoners and guards, prisoners *inter se*, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, . . . turns largely on 'purely subjective evaluations and predictions of future behavior,' indeed, the administrators must predict not just one inmate's future actions, . . . but those of an entire institution. (internal citations omitted).

Bell v. Wolfish addresses the defendant's substantive due process concerns. The Court there decided that the Due Process Clause gives the pretrial detainee the right to be free from punishment prior to being found guilty of the crimes with which he is charged in accordance with due process of law, but that "does not mean that he may not be subject to significant restrictions. The maintenance of an institution's security and discipline are 'essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." Elmaghraby at *15, quoting Bell v. Wolfish, *supra*, at 546.

As to his concerns regarding procedural due process, research has not uncovered a definitive determination of how detailed the Warden's reasons for placing an inmate in administrative detention must be within the first 24 hours of placing him there as required by § 541.22(b). In this case, the reason was "Intel Review." Nor has research uncovered a definitive determination of what satisfies the "hearing" requirement of § 541.22(c). Should the word be given its dictionary meaning, cognizant of the caution to be used in "making a fortress out of the dictionary," Cabell v. Markham, 148 F.2d 737, 739 (2d Cir. 1945) (L. Hand), or should the word be understood in the context and in the

reality of the circumstances in which the "hearing" is to be held as testified to by the attorney for the MCC quoted above?

Lending guidance here perhaps is this observation made by the Court in <u>Wolff v. McDonnell</u>, 418 U.S. 539, 560 (1974): "In determining what is 'due process' in the prison context, we are reminded that one cannot automatically apply procedural rules designed for free citizens in an open society . . . to the very different situation presented by a disciplinary proceeding in a state prison."

The ultimate answer to those questions would resolve the issues raised by the defendants regarding the sufficiency of the Special Housing Reviews' compliance with the requirements of the Regulations. Those questions need not be answered here given the determination that the defendants must exhaust their administrative remedies which the BOP has provided and by which the defendants may challenge the terms of their confinement. <u>Johnpoll v. Thornburgh</u>, 898 F.2d 849, 850 (2d Cir. 1990), cited in <u>United States v. Zampardi</u>, 1996 WL 1088905 (E.D.N.Y. 1996). In that case, the Corut wrote at *1 that "ordinarily recourse must be made to these administrative remedies prior to filing suit in federal court. This 'exhaustion requirement' promotes: (i) deference to Congress' decision to grant initial dispute resolution authority to the administrative tribunal; (ii) respect for administrative autonomy by minimizing judicial intervention; and (iii) judicial economy. <u>Terrell v. Brewer</u>, 935 F.2d 1015, 1019 (9th Cir. 1991); <u>Lyons v. U.S. Marshals</u>, 840 F.2d 202, 204-05 (3rd Cir. 1988)." <u>See</u> <u>also</u> <u>Feastor v. United States Bureau of Prisons</u>, 37 Fed. Appx. 15 (2d Cir. 2002). The Court noted exceptions to the exhaustion requirement when the administrative procedures are either unavailable or inadequate, <u>Zambardi</u>, *supra*, at *2. The administrative remedy provided

by the BOP is found in 28 CFR §§ 542.10-542.19 and has already been invoked by McTier. There is no indication in the submissions to the Court that Russell has also already invoked administrative remedies.

In a letter to the Court dated July 10, 2006 from McTier's counsel, reference was made to the MCC Warden's "Response to Request for Administrative Remedy" made by McTier which counsel requests this Court to reject as being "The Bureau's frivolous arguments for continuing administrative detention." The Warden's Response, which was not provided with that letter, was subsequently obtained by the Court and, in relevant part, states as follows:

> You are being held in SHU in Administrative Detention, a non-punitive status for which restricted conditions of confinement are required to ensure the safety of inmates or others, the protection of property, or the security and orderly running of the institution. Specifically, there are concerns with your gang affiliations (namely the Black Gangster Disciples); your current offenses involving at least three murders and two attempted murders, your history of violence consisting of criminal convictions for robbery and menacing with a weapon for which you are currently serving a New York sentence until at least July; and your poor institutional adjustment while housed in general population at MDC Brooklyn, namely two disciplinary infractions within five months of each other, including one for fighting with another inmate. Your housing status continues to be reviewed.

The characterization of the Warden's Response as "frivolous" and as a "stubborn adherence to a facially erroneous rationale, its repeated failures to afford Mr. McTier due process" and the insistence upon <u>Gotti</u> as being totally congruent with this case prompted a letter response from the BOP dated July 17, 2006. I have already indicated that <u>Gotti</u> is distinguishable on its facts from this one and is not authority for compelling

12

this case being decided similarly.

Responding to counsel's reference to the fighting with another inmate as being a "weaponless altercation," the BOP letter asserts that "In a prison setting, particularly when a gang member is involved, any and every fight has the potential to cause a serious and violent disruption, fellow gang members, gang associates and would-be gang members invariably come to the aid of their own, so that a "fistfight" can quickly escalate into a life-threatening situation for staff and other inmates." In its letter, too, the BOP denies the averment by defense counsel that it has made a decision to keep McTier in SHU permanently, and then reviews the ongoing weekly assessments regarding whether an inmate should be continued in SHU or released to the general population. And as though confirming the validity of subjective evaluations and predictions of future behavior by experienced professional prison administrators, the letter concludes with describing McTier's behavior during the preceding two months as including refusal to obey orders, inciting "other SHU inmates by loudly declaring a 'revolution'" to which other inmates responded by banging on their cell doors proclaiming a revolution. For those and other offensive behavior which is described, McTier is awaiting a disciplinary hearing.

Given the reasons for denying the relief requested by the defendants, the Court will not belabor this opinion by discussing the effect of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) that directs: "No action shall be brought with respect to prison conditions under . . . any . . . Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." See Porter v. Nussle, 534 U.S. 516 (2002) and Booth v. Churner, 532 U.S. 731 (2001).

The foregoing determination responds to the relief sought by Sharief Russell as well as to the relief sought by James McTier through the Order to Show Cause directed to the Warden of the MCC.

SO ORDERED.

Dated: Brooklyn, New York
July 20, 2006

                                               S/
                                      I. Leo Glasser