UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x
UNITED STATES OF AMERICA,

               Plaintiff,

                                                MEMORANDUM AND ORDER
   -against-                                     05 CR 401 (ILG)

JAMES McTIER, et al.,

               Defendants.
-------------------------------------------------x
GLASSER, United States District Judge:

      A hearing was held on the defendant's motion to suppress statements made to law enforcement agents. At the conclusion of the hearing, the Court makes the following findings of fact and conclusions of law.

      On November 10, 2004, Special F.B.I. Agent Jed Salter together with Special Agent Mike Powers and two detectives from the N.Y.P.D., Detective Hunter and Detective Schulman, went to the Oneida Correctional Facility in upstate New York to interview James McTier. He was serving a 5 year sentence there for robbery. They arrived there at 1:50 p.m. and were escorted to a large conference room at which Mr. McTier arrived sometime thereafter. The interview was conducted by Agent Salter who introduced himself and the others and began by asking what he characterized as "some general well being questions" to which the defendant responded, and the responses to which are not the subject of this motion. Agent Salter then explained to him that the reason for their visit was an investigation being conducted into a lot of violence in and around the Marcus Garvey Village and evidence they had that McTier participated in some of the shootings and homicides. He also told McTier that they knew that he (McTier) had information about other incidents and discussed the possibility of

obtaining his cooperation.

McTier was directed to remain silent and listen during that questionless recital and when asked, agreed to continue with the interview. Agent Salter then provided him with a Miranda form (Gov. Ex. JS5), and asked him if he could read and write. McTier said "yes," read it out loud at Salter's request, and signed the form which was witnessed by one of the detectives. McTier had no difficulty reading the form and said he understood it. Prior to being advised of his Miranda rights, no questions were asked of him nor did he make any inculpatory or other statements. After being advised of his rights, McTier agreed to be interviewed. He was told by Agent Salter that he could stop the interview at any time. He never requested an attorney, nor inquired about the availability of one.[1] The interview lasted for approximately one hour and 45 minutes during which homicides, shootings and gang activity in and around Marcus Garvey Village was discussed. The interview ended at about 4:40 p.m. when McTier said that he wanted to go to eat.

Agent Salter next saw McTier on May 24th when he was brought to the 75th Precinct in Brooklyn prior to being arrested in this case. He was with Detective Hunter when he asked McTier whether he would speak with them, McTier replied that he would on condition that he be provided with a telephone call, some food and toilet paper, which he was. He was then taken to an interview room and began to speak, but was told to stop until advised of his Miranda rights. He was again provided with the Miranda

---

[1] In his affidavit in support of his motion, McTier swore that: "As soon as the officers began questioning me I asked for an attorney. The officers proceeded to question me. I was never provided with an attorney." Agent Salter testified that his statement was false.

rights form, read it out loud and signed it. (Gov. Ex. JS6). He did not request an attorney then or at any time thereafter and agreed to speak with Agent Salter, but when asked some questions, he was unwilling to talk, saying that he told of one murder adding slight detail about it and concluded the interview. Agent Salter's notes of that interview were received in evidence without objection.

Cross-examination of Agent Salter affirmed his direct testimony that no questions were put to McTier during their initial meeting at the Oneida Correctional Facility before he was advised of and acknowledged his Miranda rights and elicited nothing of any relevant substance which differed from his prior testimony on direct examination.

The defendant was called to testify on his own behalf. Unlike the testimony of Special Agent Salter, who the Court found to be responsive to the questions put to him on both direct and cross examination and to be entirely credible, sadly, the same findings cannot be made for the defendant's testimony. A few examples will suffice.

On direct examination, the defendant recounted his being summoned to be interviewed by Special Agent Salter and his appearance at the interview room. He testified that the two F.B.I. agents and the two NYPD agents identified and introduced themselves and he was then asked:

Q:   After they introduced themselves, what, if anything did you do?

A:   I asked to have a lawyer present.

Tr. at 49-50.

In a sworn affidavit in support of his motion, he stated that : "As soon as officers began questioning me, I asked for an attorney. The officers proceeded to question me. I

3

was never provided with an attorney." Tr. at 17.

Agent Salter's testimony was that it was some time after McTier entered the interview room and after he was told to listen and not respond until after being told why Agent Salter and his colleagues were there and why and about what they wanted to interview him, and after advising him of his Miranda rights, that they put questions to him. McTier's testimony, that self-serving inconsistency aside, confirms Agent Salter's version of the event. After testifying that immediately upon entering the room and before a word was spoken to him, he said, "I asked to have a lawyer present," the transcript of the proceeding reflects his continued direct examination:

Q: What were you told?

A: I was told to wait a minute, just to hear them out.

Q: Who said that to you?

A: Agent Salter.

Q: That is Agent Salter in court today?

A: Yes.

Q: Did Agent Salter say anything to you after he told you to just wait and hear him out?

A: Yes, he did.

Q: What did he tell you?

A: He told me I was the focal point of a joint FBI NYPD investigation.

Q: Did he say anything else?

A: He did.

Q: What did he say?

4

  A: He went on to tell me about a previous indictment, which was taken down from my neighborhood and some individuals that I grew up went down.

  Q: What are you referring to when you say went down?

  A: Being locked up, incarcerated.

  Q: Did Agent Salter say anything else at that point?

  A: Yes, he did.

  Q: What did he say?

  A: He told me he had a few individuals from that indictment who were cooperating against me and placing me at the scene to certain murders and shootings.

  Q: Approximately how long did it take from the time that you entered Building 1 to begin speaking go with Agent Salter?

  A: Immediately as soon as I entered the room, after he identified himself, I asked for an attorney and we continued from there.

Tr. 50-51.

  His testimony on cross-examination was evasive and strains credulity. That testimony, in part, was as follows:

  Q: Well, had there been occasions when you were questioned while in custody?

  A: Yes.

  Q: And had you before this date ever been given your Miranda warnings?

  A: Yes, I have.

  Q: When was that, how many times had you been given your Miranda warnings in the course of your life?

A: I don't think I kept count.

Q: Was that more than once?

A: Maybe.

Q: More than twice?

A: I'm not sure.

Q: Could it have been?

A: Maybe.

Q: You were certainly aware of those rights on November 10, 2004, were you not?

A: To a certain extent.

Tr. 68-69.

\* \* \*

Q: So, we're clear, you got into the room on November 10, 2004, did you know that you – you had the right to remain silent?

A: I knew I had the right to ask for an attorney.

Q: On that prior robbery, the case you're doing five years from, did you make a statement to the police?

A: Yes.

Q: And were you Mirandized before you gave that statement?

A: Yes.

Q: And did you, in fact, write out a written confession or a written statement concerning that incident?

A: Yes, I did.

Tr. 71.

\* \* \*

Q: Sir, when you were in jail, are you aware whether or not you can call a lawyer from jail?

A: No, I'm not aware of that.

Q: Who was your lawyer on the robbery case.

A: I can't remember.

Tr. 75

\* \* \*

Q: And when Agent Salter told you to hear him out, how come it was that you agreed to hear him out?

A: <u>I just sat there and listened</u>.

Q: How come you decided to do that?

A: Because he told me I was the focal point of a joint investigation.

Tr. 76. (emphasis added.)

\* \* \*

Q: And so you wanted to hear what he had to say?

A: <u>I just sat there and I listened</u>. He kept asking questions, when he asked me the question about – when he stated about he knew my brother took a rap for me, I asked for an attorney again.

Tr. 77. (emphasis added.)

## **Discussion**

The defendant relies primarily on <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), in

7

making his motion and which he believes requires the Court to suppress his statements the government intends to introduce at trial. For the reasons that follow, his motion must be denied.

Miranda v. Arizona, 384 U.S. 436 (1966), required that what have since become known as Miranda warnings, be given to a person in custody before being interrogated regarding his complicity in criminal behavior if inculpatory statements elicited by that interrogation are to be admissible at trial. The pre-conditions for the application of Miranda are that the defendant be in custody and that he is in custody when being interrogated. I will assume without deciding, that the custodial prerequisite of the rule has been satisfied notwithstanding that the assumption is not free from doubt. Although it is plain that serving a state sentence of imprisonment for the crime of robbery at the time of the first interview, he was in custody, it was the custody of the New York State Department of Corrections and not in the custody of the officers who came to interview him. Whether he truly believed he was not free to terminate the interview at any time and leave the interview room (see Tr. at 67-8), as he felt free to do when sought to be interviewed again in the 75th Precinct of the N.Y.P.D. need not be determined concluding, as I do, that neither Miranda nor Seibert were offended simply because there was no pre-warning interrogation and no pre-warning inculpatory statements sought to be introduced at trial.

The testimony elicited at the hearing clearly and convincingly established that prior to being given his Miranda warning he made no statement, inculpatory or otherwise, nor was he asked any questions. He was explicitly told to listen and say nothing, an admonition which he also acknowledged receiving. Tr. at 76, *supra.* The

testimony elicited and my findings regarding credibility, clearly and convincingly establish that he was fully apprised of and understood his Miranda rights and he knowingly and voluntarily waived them and the answers he gave thereafter in response to questions that were asked, were given voluntarily and free from coercion. Missouri v. Seibert, and its progeny and the recently decided United States v. Bearam, 2007 WL 1662061, are plainly distinguishable.

  The motion is, therefore, denied.

  SO ORDERED.

Dated:  Brooklyn, New York
     July 10, 2007

                      S/
                     I. Leo Glasser